FILED
2014 Mar-27  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **VIRGINIA D. HANS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **3:12-CV-03572-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On January 15, 2010, the claimant, Virginia D. Hans, applied for a period of disability and for disability insurance benefits under Title II of the Social Security Act. (R. 19). The claimant had previously applied for disability, but on July 24 2009, at claimant's request, ALJ Cynthia Weaver dismissed claimant's request for a hearing to challenger her denial. (R. 79). The claimant currently alleges disability commencing on July 25, 2009 because of back and shoulder problems, heart problems, acid reflux, and mental health problems. (R. 177). The Commissioner denied the claim both initially and on reconsideration. (R. 1).

The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 3, 2011. (R. 19). In a decision dated April 13, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for a period of disability or disability insurance benefits. (R. 33). On August 10, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision

became the final decision of the Commissioner of the Social Security Administration.  (R. 1).
The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant
to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, this court affirms the
decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant, who did not file a brief, did not present any specific issues for review;
therefore, the court will review the record to determine whether the Commissioner properly
applied the legal standards and supported his factual conclusions with substantial evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must
affirm the Commissioner's decision if the Commissioner applied the correct legal standards and
if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g);
*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999
(11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,
including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826
F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*.
The court will affirm those factual determinations that are supported by substantial evidence.
"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402
U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARDS

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, supbt. P, app. I?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

At step two, in determining whether the claimant possesses a severe impairment, the Commissioner must consider whether the impairment significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.920(c); *see also* 20 C.F.R. § 404.921(a), *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  According to

the Eleventh Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *McDaniel*, 800 F.2d at 1031; *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).

At step three, the claimant has the burden of proving that an impairment or impairments meet or equal a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). Listing 12.04 addresses affective disorders and listing 12.06 addresses anxiety related disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

At step four, the claimant bears the burden of demonstrating that he cannot return to his past relevant work. *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir. 1990). To support a conclusion that the claimant can return to her past relevant work, the ALJ must consider all the duties of that work and evaluate the claimant's ability to perform them in spite of her impairments. *Lucas*, 918 F.2d at 1574; *see also Cannon v. Bowen*, 858 F.2d 1541, 1545-46 (11th Cir. 1988) (remanding to the Commissioner to determine whether claimant's past work included prohibited activities). The ALJ must consider whether the claimant held the job within the past fifteen years; whether the job counts as substantial gainful activity; and whether the claimant learned to do the work. 20 C.F.R. § 416.960(b)(1).

At steps four and five, the ALJ reviews medical and other evidence to determine the claimant's residual functional capacity ("RFC") to do work despite her impairment. 20 C.F.R. §§ 404.1520(e) and 416.920(e); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). An RFC assessment involves determining the claimant's ability to do work in spite of her impairments and in consideration of all relevant evidence. *Lewis*, 125 F.3d at 1440; *see also* 20

4

C.F.R. §§ 404.1545(a), 416.945(a).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b). Where the record is inconclusive as to the claimant's residual functional capacity, however, the record must be further developed through vocational expert testimony.  *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131-32 (11th Cir. 1986). Throughout the decision, the ALJ must state with particularity the weight given to different medical opinions.  Failure to do so is a reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

If the ALJ decides to discredit the claimant's testimony as to her pain, he must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting claimant's testimony requires that the court accept the testimony as true.  *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).  A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record.  *Foote*, 67 F.3d at 1562.  The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain.  *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

The Global Assessment Functioning Score ("GAF") is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.  *Wesley v.*

5

*Comm'r of Soc. Sec.,* No. 99-1226, 2000 WL191664, at *3 (6th Cir. 2000)).  An assessment of a

GAF score of 50 or below can indicate serious mental impairments in functioning.  *McCloud v.*

*Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citing the American Psychiatric

Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994)).  For any

GAF score in the medical record revealing possible serious mental impairments, the ALJ should

determine what weight, if any, to give that particular score.  *Id.*  However, the  GAF scale "'does

not have a direct correlation to the severity requirements in [the] mental disorders listings.'"  *Nye*

*v. Comm'r of Social Sec.*, 524 Fed. Appx. 538, 543 (11th Cir. 2013).  Therefore, the ALJ is not

required to rely on a GAF score in making his ultimate disability determination.  *Luterman v.*

*Commissioner*, 518 Fed. Appx. 683, 690 (11th Cir. 2013).

## V. FACTS

The claimant has a high school diploma and was fifty-one years old at the time of the

administrative hearing.  (R. 176-78).  Her past relevant work experience includes employment as

a sewing machine operator, a loan originator, and a hand packer.  (R. 64).  The claimant alleges

that she is unable to work because of both mental and physical impairments, including arthritis,

back and shoulder pain, reflux, heart problems, depression, and schizophrenia.  (R. 177-78).

*Physical and Mental Limitations*

Claimant saw Dr. David Bruce Laughlin at Shoals Medical Clinic beginning in February

of 1998, when she complained of chest pain and anxiety.  She began taking Xanax for depression

and her chest pain had disappeared by her next visit on March 13, 1998.  (R. 374).  She continued

to see Dr. Laughlin over the upcoming years, often going in for sinus, kidney, or foot problems.

She sometimes complained of pain in her back, neck or shoulder pain, or depression, but often

did not mention them at all.  (R. 344-74).

On March 14, 2003, claimant again visited Shoals Medical Clinic complaining of chest pain, among other symptoms.  The report from her follow up appointment the next month, however, does not mention any chest pain.  (R. 370-72).  On August 5, 2003 and August 15, 2003, claimant returned to Dr. Laughlin, complaining of pain in her right neck, upper chest, right shoulder, and back.  (R. 363-65).  At the August 15, 2003 appointment, Dr. Laughlin examined claimant's cervical spine, noting that the "vertebrae appear to be in good alignment," "no significant abnormalities," and "mild degenerative changes noted on the posterior aspect of C6-7 possibly present."  (R. 381).

On November 10, 2003, claimant went to the Shoals Medical Clinic for right shoulder pain and right upper chest pain.  (R. 357).  On September 16, 2004, claimant saw Dr. Laughlin after being involved in a "train/car" accident. Dr. Laughlin diagnosed "superficial bruising, cervical spasm and injury to the right shoulder which seems improved at the present time." (R. 348).

Claimant went to Med Plus Muscle Shoals Inc., part of the VA System, from December 2003 to January 2011 for a variety of needs from mammograms to kidney stones.  Throughout that time, she reported back pain, shoulder pain, and depression, but the reports show that all three were stable and under control, with only a few exceptions.  (R. 277-342, 799-847, 910-999).  On her first visit on December 8, 2003, claimant reported mild depression, history of occasional heart palpitations, chronic low back pain—possibly resulting from pulling a muscle in her lower back while in the Airforce—and chronic right shoulder pain from a previous work injury.  The examining physician noted that he was unable to reproduce the chronic low back

pain that she was describing. Claimant denied further evaluation of her back at the time.  (R. 329-31).

On November 16, 2004, claimant saw psychiatrist Mary Bowers, PhD at  Riverbend Center for Mental Heath complaining of depression and difficulty with concentration, memory, motivation, and sleep.  According to the report, her "presenting problem" was depression and anxiety about not being able to get and hold a job.  Claimant reported having attempted suicide once at age sixteen, but claimed that she was not currently having suicidal thoughts.  The "Mental Status Summary Assessment" of Dr. Bowers's report stated that the claimant was "even unsure about why she was here & if she really wanted service."  Claimant admitted to former drug and alcohol use and reported being physically and emotionally abused by her mother growing up.  (R. 265-75).

On February 25, 2005, claimant returned to Riverbend for individual therapy, having requested to see a different therapist.  Her report reflects that she was having hallucinations, reported poor sleep and appetite, and was not complying with her prescribed medications.  According to the notes, claimant was talkative during the session and focused mainly on her depression related to her job problems.  (R. 263-64).  On March 9, 2006, Riverbend issued a discharge report for claimant because she had not had a service in twelve months.  (R. 262).

Claimant did not see Dr. Laughlin for nearly a year following her September 2004 appointment, but returned on July 14, 2005, complaining of right shoulder pain, fatigue, and depression, among other symptoms.  He prescribed Lexapro for her depression.  (R. 348).  At an August 22, 2005 follow up with Dr. Laughlin, he noted that "[s]he stands all day at work packing boxes of books," but that "[s]he is not complaining of her back." He also noted that she had not

8

been taking her Lexapro regularly.  (R. 347).

On September 28, 2005, claimant failed to show up for an appointment at the VA clinic. (R. 316).  On a February 24, 2006 visit, claimant described having depression since she was a teenager, but stated that she had run out of her medication and had not gotten it refilled.  (R. 308).

On April 12, 2007, claimant saw Dr. Kenneth W. Collins at the VA clinic requesting medication for pain in her lower back and describing her pain as a 4 out of 10. Dr. Collins ordered "L-Spine" x-rays, which showed degenerative changes.  He recommended a steroid pack or injection, continued use of Naprosyn to decrease inflamation and degradation, and physical therapy if claimant's pain continued.  (R. 304-05).

On May 3, 2007, claimant went to the VA clinic complaining of dizziness off and on. (R. 276-77).  On May 8, 2007, claimant returned to Dr. Laughlin for dizziness problems, but also noted a fluttering sensation in her chest once or twice a year and pain in her shoulder, back, and neck.  (R. 346).

On May 22, 2007, claimant refused a nutrition consult at the VA.  (R. 294).  On September 17, 2007, claimant went to the Muscle Shoals clinic for a routine appointment.  Her report noted no disabilities, a diagnosis of depression that was stable when on Citalopram, which she did not take regularly, and a diagnosis of stable chronic lower back pain.  (R. 282-87).  On March 17, 2009, April 18, 2008, and May 9, 2008, claimant failed to show up for scheduled lab tests.  (R. 847).

In an undated disability report, claimant described her mental and physical impairments, as noted above, and claimed to have stopped working on July 1, 2007 because of her condition.

(R. 177-78).  On a different undated disability report, she stated that she cannot do physical activities, cannot lift, push or pull, and gets very depressed.  On that report she alleged that she became unable to work because of her conditions on January 15, 2000, but then stated that she stopped working on August 17, 2007.  (R. 229).

On February 7, 2008, claimant saw Dr. Laughlin, complaining of lower back pain on her right side that hurt primarily at night, along with worsened arthritis in her right shoulder, back and neck. Dr. Laughlin noted claimant's noncompliance with her daily medicine regime.  (R. 344).

On February 4, 2008, claimant filed out a Daily Activities Questionnaire, noting that she wakes up two to four times a night because her condition and can hardly sleep on her right side. She reported performing household chores, leaving the house three to four times a week to shop, walk, and attend church and the doctor's office, and having difficulty concentrating.  She described struggles with depression, arthritis, and back pain, and stated that she quit her last two jobs because of sickness, pain, depression, and an inability to stay focused.  (R. 239-43).

On March 3, 2008, Dr. James E. Crowder, a clinical psychologist, performed a mental examination on claimant at the request of the disability specialist.  According to Dr. Crowder, claimant last worked at a convenience store for two weeks, but quit working in August 2007 because of pain, discomfort working with her ex-sister-in-law, and uncomfortable hours. She denied having a history of drug or alcohol abuse.  Dr. Crowder noted that claimant was somewhat depressed, that she had intact remote and recent memory, that her concentration was good but her abstract thinking was poor, and that her primary complaint was pain.  He diagnosed her with depressive disorder and gave her a GAF score of 70.  He ultimately determined that she

had "slight limitation [in] her ability to relate to others, slight constriction of interest, and no restriction of daily activities based on her mental condition alone." (R. 404-06).

On March 10, 2008, Dr. Robert Estock performed a psychiatric review of claimant's medical records. He noted that claimant had impairments but that they were not severe and marked that the medical disposition was based on category 12.04, "Affective Disorders." He ultimately determined that claimant had depressive disorder, not otherwise specified. He rated claimant as having mild limitations in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace, and rated her has having no episodes of decompensation. He determined that the evidence did not establish the presence of the "C" criteria for categories 12.04 or 12.06. (R. 417-29).

On April 3, 2008, claimant returned to Dr. Laughlin for her lower back and right shoulder pain. She told him she had seen a lawyer about disability and that the lawyer told her she needed an MRI. Dr. Laughlin also noted that claimant had lost several of the prescriptions she had previously been given. (R. 606). Claimant also returned to Dr. Laughlin for her back and shoulder pain on July 8, 2008 and July 31, 2008. (R. 601-02).

On September 25, 2008, claimant saw Dr. Laughlin, again requesting an MRI for her disability claim. Dr. Laughlin ordered an x-ray of her lower spine, but "[a]dvised that I felt that an MRI was not indicated in view of her symptoms." He further told claimant that "weight reduction would probably do her back more good than anything." (R. 599-600). On October 9, 2008, Dr. Laughlin ordered a lumbar spine x-tay with obliques that showed degenerative disc disease at L4-L5. (R. 654). At a follow up on October 30, 2008, he noted that claimant's back was improving well, and at a January 29, 2009 appointment he noted that she was in no pain and

her back pain was controlled.  (R. 592-94).

On April 30, 2009, claimant again complained of back, neck, and chest pain and requested drugs for the pain.  At that visit, Dr. Laughlin also marked that claimant's depression was controlled.  (R. 591).

On June 23, 2009, Dr. Faizullah Syed admitted claimant to Helen Keller Hospital because of her complaints of chest pain.  She had serial cardiac enzymes, a CT of the head, and an MRI of the neck, then had a cardiology consultation at Helen Keller Hospital with Dr. Randall Little. Dr. Little did not note anything unusual in examining claimant, but ordered an echocardiogram. The MRI of claimant's cervical spin was normal and the CT scan showed mild generalized cardiac enlargement, but no evidence of significant coronary artery stenosis or plaque.  Her echocardiogram revealed normal ejection fraction, normal size and function, no evidence of mural thrombus, no significant pericardial effusion, and mild tricuspid regurgitation.  (R. 567-75).

On June 29, 2009, claimant saw Dr. Jerry Williams at The Heart Center, Inc.  He recorded that claimant had a history of chest pain with normal cardiac CCTA, a history of hyperlipidemia, and a history of cardiomegaly.  He noted that claimant had no chest pain, blockages, or plaque formation, and he had a long discussion with claimant about trying to lose weight.  On December 16, 2009, he noted that claimant had no chest pain or symptoms of congestive heart failure.  (R. 537-40).

On July 22, 2009, claimant returned to Dr. Laughlin complaining of back pain and again requested an MRI.  (R. 583).  On July 30, 2009, claimant told Dr. Laughlin that her back was "ok" that day, but that she was still having pain generally.  (R. 582).  In the fall and winter of

12

2009, claimant continued to see Dr. Laughlin for sinus and bladder problems, but did not mention back pain.  (R. 577-81).

In routine follow up appointments at the VA clinic from July 2009 through January 2011, doctors continued to note claimant's chronic low back pain and depression.  (R. 447-533, 910-99).  On July 31, 2009, claimant had a social work assessment at the VA clinic.  According to Visunda Giddy, the social worker, claimant reported being sexually abused by her grandfather, reported having significant financial problems that caused her stress, reported having back pain rated as a 5 out of 10, and reported having delusions and hallucinations.  Ms. Giddy "diagnosed" claimant with major depressive disorder, risk of schizophrenia, and risk of PTSD, and sent claimant to monthly therapy, to a psychiatrist for medication, and told her to attend the women's depression/PTSD group at the VA.  (R. 515-20).  On August 6 and 25, 2009, claimant reported back to Ms. Giddy, stating that her "PTSD is about the same."  (R. 512-13.)  Claimant continued to see Ms. Giddy through at least April 2010.  (R. 447-513, 722-55, 986-990).

On August 27, 2009, Dr. Marie Glenn, a psychiatrist at the VA, examined claimant. Claimant told Dr. Glenn that her main concerns revolved around having increased difficulty getting organized with her chores so she has time for her art work and having problems with forgetfulness.  Claimant described both auditory and visual hallucinations and told Dr. Glenn that she sees her psychotic symptoms as a "gift" and that she is not interested in getting rid of them. (R. 501-06).

On September 29, 2009, Dr. Ronald Larson at the VA clinic composed a psychology assessment report of claimant.  He administered the MCMI3, Bender-Bestalt, BDI and BAI tests. He first noted that tests suggest "a moderate exaggeration of current emotional problems that is

likely to have been sufficiently corrected so that it does not affect the test's interpretative validity." He found that claimant had a significant depressive personality pattern, and an elevated, but not significant, negativistic personality. She had a high but not significant tendency toward schizotypal personality disorder, and elevated anxiety disorder scale and dysthymic disorder scale. Her major depression scale was elevated and she scored high on the delusional disorder scale. (R. 489-93).

On October 19, 2009, Dr. Glenn noted that claimant reported some improvement in her depression and only intermittent fleeting auditory hallucinations. (R. 480-81). On December 21, 2009, claimant visited the VA clinic. She reported some improvement in her depression, denied delusions, but did claim to have intermittent fleeting auditory hallucinations. Dr. Glenn noted that claimant suffered from bereavement, that she did not meet the diagnostic criteria for post traumatic stress disorder, that she had a cognitive disorder that needed to be clarified, and that her GAF was 47. (R. 447-50).

On October 27, 2009, Dr. Larson saw claimant again for a psychotherapy appointment. Claimant reported that since her last visit, she was doing fine and would like to lose weight and get more energy. She reported symptoms of depression such as pervasive sadness, recurrent feelings of anger, night sweats, irritability, and restless and interrupted sleep. She rated her pain as a 4 out of 10 and reported feeling stable on her medication. Dr. Larson gave her a GAF score of 50 and recommended that she attend group therapy. (R. 754-59).

On December 21, 2009, Dr. Glenn examined claimant, noting that her sister had died in September 2009 and that claimant was feeling sad and anxious. Claimant denied feeling overwhelmed or hopeless or having problems with nightmares or intrusive memories. Dr. Glenn

diagnosed claimant with bereavement and mild recurred depression.  She noted the need to rule

out PTSD and that claimant displayed paranoid and schizoid traits.  She gave claimant a GAF of

47, noting that her symptoms "interfere with socialization, occupational functioning; they also

interfere in relationship with husband and do cause some personnel [sic] distress to patient."  (R.

726-29).

On February 19, 2010, claimant filled out an Adult Function Report, describing her day

as consisting of activities such as taking her son to school, doing household chores, shopping,

taking care of her 21-month-old nephew, cooking, paying bills, watching her granddaughter in

the evenings, and putting her nephew to bed.  (R. 160).  In addition to caring for children, she

discussed caring for her husband after he had surgery and caring for pets.  She stated that she had

no problem with personal care, but that sometimes the pain in her lower back or upper chest

made it difficult to sleep.  She noted being forgetful, and often needing to write notes to herself

or have her husband give her reminders.  She reported that she went outside daily unless it was

cold, and sometimes mowed the grass on a riding lawn mower.  According to the report, her

conditions affect her lifting, walking, memory, and concentration.  Although she reported that

she could walk one mile before needing to rest for ten minutes, she also stated that pain in her

lower back made it difficult to walk.  She also reported that despite the pain that she experiences

when lifting heavy objects, she sometimes had to lift anyway, such as when putting her nephew

in his car seat.  Finally, she noted that she sometimes hears voices and sounds that she does not

understand.  (R. 163-68).

On February 28, 2010, claimant filled out a Cardiovascular Questionnaire, reporting that

she used to exercise but does not exercise anymore.  She reported that she could walk from half a

mile to one-and-a-half miles in 45 minutes to an hour.  She stated that she had pain in her lower and middle back after walking a couple of blocks and that she also experienced discomfort from sweeping, stooping or bending a lot, lifting, pulling, or tugging.  She reported that she experiences pain in her back, neck, shoulders, and upper right chest that lasts one to three days and takes thirty minutes to half a day of rest to relieve.   (R. 171-72).

On March 4, 2010, Dr. Kirstin Bailey performed a psychiatric review technique of claimant's medical record.  She noted that claimant "alleges schizophrenia and had an initial [diagnosis] of Psychotic [disorder] NOS at inital [sic] meeting with psychiatrist, however, more recent [diagnosis with] same psychiatrist have included Bereavement, MDD recurrent Mild w/o residual psychotic symptoms and not schizophrenia."  She concluded that "[o]verall, although [claimant] has a history of depression and symptoms of anxiety, these [symptoms] do not appear to be having a significant negative impact on her functioning." (R. 548-60).  In filling out a mental residual functional capacity assessment that same day, Dr. Bailey determined that claimant was moderately limited in her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to accept instructions and respond appropriately to criticism from supervisors; and her ability to respond appropriately to changes in the work setting.  The conclusions of Dr. Bailey's functional capacity assessment were: (a) "Claimant can understand, remember, and complete short, simple,

16

1-2 step tasks, but may need practice with those that are longer and more detailed;" (b) "[Claimant] should be able to concentrate and attend to routine tasks for extended periods and will need all customary rests and breaks.  [Claimant] would benefit from a flexible schedule as 1-2 days of work a month may be missed due to mental health symptoms.  [Claimant] would benefit from a familiar work routine but should avoid excessive work loads, quick decision making, and multiple demands;" (c) "[Claimant's] interaction with the public should be casual. Feedback and criticism should be given in a non-confrontational and supportive manner;" (d) "Changes in work setting should be presented gradually and infrequently to give time for adjustment. Help with long term goals and planning is needed; day to day ones can be managed by the [Claimant]."  (R. 562-64).

On March 7, 2010, claimant had an appointment at the VA with a Psychiatric Nurse Practitioner/Clinical Nurse Specialist appointment.  Claimant reported pervasive sadness and insomnia—although she reported averaging six hours of sleep per night—but also reported improvement in her nightmares, energy, anhedonia[1], concentration and anxiety since her last mental health visit.  She described her pain as a 1 out of 10.  The nurse diagnosed bereavement, recurrent, mild Major Depressive Disorder, cognitive disorder to be clarified, and a GAF of 47. The report states: "These symptoms appear to be globally severe and make it difficult for this patient to function emotionally, interpersonally, maintaining basic socialization and support system, [and] functioning in the work place."  (R. 992-96).

On June 14, 2010, claimant returned to the VA for another Psychiatric Nurse Practitioner appointment.  The Nurse Practitioner's report recorded many of the same symptoms as the March

---

[1]Anhedonia is the inability to experience pleasure from activities usually found enjoyable.

2010 visit, but also noted that claimant was experiencing subtle paranoia, delusions and hallucinations.  Claimant reported being in no pain and the nurse gave her a GAF of 47.  (R. 963-69).  Claimant returned for another Psychiatric appointment on September 7, 2010 and received a nearly identical report, including the same GAF score of 47.  (R. 955-58).

On December 1, 2010, Dr. Glenn saw claimant for a follow up visit.  Dr. Glenn noted that claimant reported improvement in her depression and psychotic symptoms and that "she is back to enjoying her craft - although she gets sad easily still."  She diagnosed claimant with schizoaffective disorder and "depressed mild to moderate" and gave her a GAF of 45.  (R. 931-33).

On July 20, 2010, claimant returned to Dr. Williams at The Heart Center for a follow up appoitment, reporting some chest pain that resolved on its own. Dr. Williams ordered an EKG, which showed normal sinus rhythm and non-specific ST-T wave changes.  (R. 1023-26).

On November 10, 2010, claimant saw Dr. Timothy Martin for her reflux and kidney problems.  He noted her "well-controlled" chronic back pain and depression and noted that claimant denied having any psychological symptoms.  On January 5, 2011, claimant returned to Dr. Martin, complaining of mood disturbance and depression, in addition to her intestinal problems.  On January 24, 2011, when claimant returned for a yearly female exam, she reported that her depression and anxiety had improved since her last visit.  (R. 1002-12).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ.  (R. 41).  At the March 3, 2011 hearing, the claimant testified that she lives with her husband and fourteen-year-old son, who

18

goes to school, but is not involved in any extracurricular activities.  Claimant stated that she gets

up around 6:00 or 6:30 in the morning, has coffee, and gets her son up.  Around 10:00 she takes

her medications—Omeprazole for her acid reflux, Mobic or Meloxicam for arthritis pain in her

shoulder, Aripiprazole for her mental disorder, Allegra for her allergies, Citalopram for her

depression, and Gabapentin for her back and shoulder pain.  At night she takes Simivastatin for

cholesterol and other medications as needed.  (R. 51-53).

Claimant testified to being 5'4" and weighing about 248 pounds.  In the mornings, after

her son goes to school, she makes the bed then sweeps and mops if it needs to be done, although

she claimed that any kind of stooping activity causes her back to hurt and she will have to sit

down in between rooms.  She also sometimes takes extra medication such as Tylenol or pain

patches.  She does needlework during the day and sometimes goes shopping.  She has special

shoes that are supposed to help her back, but still has to sit down occasionally if out shopping.

She also goes to church on Sunday mornings.  When asked if she performed any activities that

the ALJ was not asking about, she said that she could not think of any and stated: "I think I'm

getting Alzheimers or whatever you want to call it. I'm slow to think.  Sometimes things slip my

mind or I can't think of what I need to say, you know."  (R. 53-55).

Claimant testified that she had worked for American Wholesale Book Company until

June 5, 2007.  She had difficulty doing the job because of pain in her back, legs, and shoulder.

She felt like she was not accepted by the people who worked there, and that the people were

talking behind her back.  She left that job and then went to work at Dixie Oil Company, but only

worked there for a week and a half or two weeks.  She left that job because she was required to

stand up, which caused her lower back to hurt badly, and because it was in the middle of the

night and she thought it was dangerous for a woman.  (R. 56-58).

Claimant described her memory problems, saying she writes notes to herself or has her husband remind her of important things she needs to remember.  Since July of 2009, she has been going to the VA every three months.  When asked if she had participated in PTSD classes, she replied: "What is PTSD?"  Upon explanation, she answered that for about three months she participated in a class with Shay Giddy that was supposed to be a group class, but she was often the only one in there, which aggravated her.  She testified that she had sleeping problems, getting up three or four times a night to go to the restroom or because she was hurting.  (R. 58-59).

Claimant testified that during the day she sometimes feels like her life has come to a standstill and described herself as a sad person.  She sometimes feels worthless, has difficulty concentrating, and gets things mixed up, although she did state "[t]here's times when I do all right."  She testified that she sometimes gets behind on her housework because she does not get much help from her husband, and feels overwhelmed and useless.  She said that her Citalopram helps, but she sometimes forgets to take it when she is really busy and on the go.  (R. 59-62).

Claimant testified that the major reason she cannot work anymore is her mental disorder, specifically her depression.  She feels like if people find out, she will be an outcast.  She also complained of her back and shoulder pain, stating that she could bend fine, but stooping hurts. She tries to walk but it causes her pain, and she has gained weight because she cannot be very active. She did say that she feels better after having been active.  (R. 62-63).

The ALJ then called on Marcia Shulman, a vocational expert, to testify.  She described claimant's past relevant work experience as including sewing machine operator, light and semi-skilled with a specific vocational preparation ("SVP") of 3; a loan originator, sedentary and

skilled with and SVP of 7; and a hand packer, medium and unskilled.  When asked to examine claimant's vocational profile and apply it to the exhibits, Ms. Shulman testified that Dr. Crowder's examination report would not preclude past work but that Dr. Bailey's mental RFC assessment would limit claimant to simple work. Ms. Shulman explained that GAF scores are a snapshot at a particular time, which explain the difference in scores on various different days. Ms. Shulman concluded that claimant could no longer perform skilled or semi-skilled jobs, but could still perform the job of hand packer.  Other unskilled jobs that might be available would include assembler, machine tender, and cleaner/housekeeper.  Ms. Shulman then testified that claimant's pain and mental problems, if moderately severe or greater, would preclude her from performing past work or other work.  (R. 64-67).

Claimant's attorney then questioned Ms. Shulman, asking her whether it would be vocationally relevant if someone had "moderate difficulties in maintaining concentration, persistence of pace and one or two episodes of decomposition, each of extended duration."  She answered that it would be relevant and could preclude semi-skilled or skilled work.  The attorney then asked Ms. Shulman to look at Dr. Bailey's mental RFC assessment, a document which was marked "moderate" as to claimant's ability to maintain attention and concentration, perform activities with a schedule, complete a normal work day and week without interruptions, ability to accept instructions and respond appropriately to criticism, and ability to respond appropriately to changes in the work setting.  Ms. Shulman confirmed that these limitations would rule out the jobs of sewing machine operator and loan originator, leaving only the hand packer job.  (R. 67-69).

The attorney next asked Ms. Shulman about GAF scores, to which she replied: "I do not

give much consideration in my private practice to using the GAFs because I think they're very temporary in that they are a rating of, or a snapshot of that person and what's going on at a particular time."  The attorney asked if the GAF scores would be more credible if they had been consistent from July 2009 to December 2010.  Ms. Shulman testified that other factors, such as how often the patient was seen, would determine whether the GAF scores had significance, but that she would still not give them controlling weight from a vocational standpoint.  When asked to look at a specific medical record, Ms. Shulman agreed that a GAF below 50, if consistent over time, would have some negative impacts on many areas of life.  She ultimately stated that even GAF scores between 43 and 50 occurring over a year's period of time, would need to be considered in light of how frequently the individual was being rated, and whether the clinic notes and therapy notes support that level of rating.  (R. 69-71).

Finally, the attorney asked Ms. Shulman whether the job of a hand packer required the use of the right dominant hand.  She answered affirmatively and testified that if an individual could only use the right hand occasionally for both fine manipulation and gross manipulation, it would limit the number of jobs that could be performed, but would still allow the individual to perform a cleaning job.  In performing a cleaning job, if the individual had to take frequent, unscheduled breaks that took that individual totally away from her work—as opposed to just a change of position or duty—it would impact her ability to perform the job.  (R. 71-72).

*The ALJ's Decision*

On April 13, 2011, ALJ Joseph F. Gilliland issued a decision finding the claimant was not disabled under the Social Security Act.  (R. 19).  As preliminary matters, the ALJ found that the claimant last met the insured status requirements of the Social Security Act on December 31,

2009, that she did not engage in substantial gainful activity during the period from her amended alleged onset date of July 25, 2009 through her date of last insured, and that she had the following severe impairments: "discogenic degenerative changes L4-5, arthritis, obesity, schizoaffective disorder, depressed mild to moderate; rule out underlying post traumatic stress disorder (PTSD), bereavement, and rule out cognitive disorder not otherwise specified – to be clarified."  (R. 21).

The ALJ then found that through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  He specifically addressed listings 12.04 and 12.06. In finding that claimant did not meet listing 12.04, the ALJ considered whether the "paragraph B" criteria were satisfied.  He concluded that claimant's mental impairments did not cause at least two of the marked limitations or one of the marked limitations plus repeated episodes of decompensation.  He noted that claimant's medical impairments resulted in no restrictions of daily activities and only mild difficulties in maintaining social functioning. "Furthermore, her impairments cause no more than moderate deficiencies in concentration, persistence, or pace, but have resulted in one or two episodes of deterioration or decompensation in work or work-like settings."  (R. 21-22).

Under the "C" criteria for listing 12.04, the ALJ found that the record did not show "a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do work activities and treated with medication or psychological support" and resulting in one of the conditions described in the listing.  The ALJ also found that claimant did not meet the "C" criteria for listing 12.06 because

the record did not show "a complete inability to function independently outside the area of one's home."  (R. 22).

The ALJ then noted that his evaluations under the listings were separate and apart from his residual functional capacity evaluations, which he proceeded to make.  He found that claimant had the residual functional capacity to perform medium work with the following limitations:

> [S]he can understand, remember and complete short, simple, 1-2 step tasks but may need practice with those that are longer and more detailed; she should be able to concentrate and attend to routine tasks for extended periods and will need all customary rest and breaks; she would benefit from a flexible schedule as 1-2 days of work a month may be missed due to mental health symptoms; she should be able to complete an ordinary routine without additional supervision; she would benefit from a familiar work routine but should avoid excessive workloads, quick decision making, and multiple demands; her interaction with the public should be casual and feedback and criticism should be given in a non-confrontational and supportive manner; changes in the work setting should be presented gradually and infrequently to give time for adjustment; help with long-term goals and planning is needed but day-to-day ones can be managed by the claimant.

(R. 23).

In making this finding, the ALJ considered the claimant's symptoms, using the two-step process to determine whether the medically determinable impairments could reasonably be expected to produce claimant's symptoms and to determine the extent to which the intensity, persistence, and limiting effects limit claimant's ability to function.  After summarizing her hearing testimony, the ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the RFC.  (R. 23-24).

24

To support this determination, the ALJ noted that the record does not contain any opinions from any physicians indicating that the claimant is disabled or has any limitations greater than the ones included in his RFC.  He asserted that the medical evidence is inconsistent with allegations of disabling levels of pain, citing to the x-rays and other tests, as well as the many examinations where claimant reported little to no pain and the treating physicians noted that her back pain was under control.  The ALJ also cited the conservative treatment plan used by claimant's doctors, involving primarily oral medication and liberally spaced follow-ups, and not requiring any surgery or hospitalizations.  (R. 24).

The ALJ discussed claimant's back pain and arthritis/shoulder pain, stating that the record reflects it was controlled and intermittent and had not kept her from working in the past. The ALJ also discussed claimant's obesity, noting that it was not a new problem for claimant and that no physician had reported that it limited her or caused her musculosketal problems in any way.  She had not been diagnosed with any impairments secondary to obesity, had successfully worked with similar body weight in the past, and described daily activities consistent with good functioning.  (R. 25-26).

The ALJ then looked at claimant's mental impairments, determining that "the medical evidence of record is inconsistent with any greater than moderate difficulties."  The ALJ reviewed claimant's many doctors visits where she was described as being in no distress and her depression was noted as being well controlled.  She attended only one therapy session at Riverbend Center for Mental Health in 2004, and quit attending the PTSD sessions at the VA after three months.  She has no history of psychiatric hospitalization, and only took her depression medicine intermittently.  The ALJ described her as having one "flare up" in 2010, but

noted that she responded to the medication adjustment and reported being "back to enjoying her craft."  He finally noted that no evidence exists that "the claimant was found in need of intensive outpatient therapy or that she had symptoms of the severity to be referred to a specialist or found in need of formalized testing for any cognitive problems."  (R. 26-27).

The ALJ then described her extensive daily activities, noting that they were not limited to the extent one would expect given the symptoms claimant was claiming.  He specifically noted that the activities claimant reported in February 2010 contrast sharply with the abilities she reported in her March 2011 hearing, and the clinical evidence was inconsistent with such a significant change.  He further noted the inconsistencies even with claimant's hearing testimony. The ALJ discussed claimant's admitted functional abilities, such as walking, child care, cooking, sewing, housekeeping, etc., noting that they support his RFC finding.  (R. 27-28).

The ALJ noted other inconsistencies in the record, including claimant's differing reports to various doctors about her history of alcohol or drug use, suggesting that she gave less than truthful information on at least one occasion.  He also concluded that her motivation to work was suspect because she quit her job and had not looked for more suitable work.  Her date of onset had no significance other than being the day after the denial of her previous disability claim, and she delayed in filing her application for benefits, with no explanation of the delay.  "Most notable," according to the ALJ, is claimant's ability to provide care for others, which suggests that the reason claimant is not working is not solely because of her alleged impairments.  (R. 28-29).

Next, the ALJ described claimant's "generally unpersuasive appearance and demeanor while testifying at the hearing," emphasizing that she demonstrated no memory problems.  He

considered claimant's work history, noting its inconsistency and that her quitting work because of pain in 2007 was not accompanied by corresponding medical treatment.  (R. 29).

After outlining the guidelines regarding the weight given to various medical opinions based on their ties to the individual, the ALJ determined that he should give great weight to the opinion of Dr. Bailey, the State agency psychologist, because her opinions were consistent with the medical evidence and because she had access to all of claimant's records, including her disability forms where she described activities indicative of good mental and physical functioning.  The ALJ also considered the 2008 consultation report of Dr. Crowder, which reflected good mental functioning soon after claimant's alleged inability to work in 2007 because of mental difficulties.  (R. 29-30).

The ALJ then addressed claimant's heavy reliance on her low GAF scores in VA medical records. He asserted that a GAF of 41-50 is indicative of serious symptoms; however, such scores alone are not indicative of disability, but must be supported by objective findings. In this case, the ALJ believed the low GAF scores were not supported by the medical record or claimant's own reports of her daily activities. He stated: "In the face of the good findings on examination, the VA doctors gave no rationale or pointed to no specific clinical or objective evidence to support the given GAF scores."  (R. 30).

As to the opinion evidence on the record regarding physical impairments, the ALJ noted that he gave no weight to the reviewing state agency physicians, because they did not have the opportunity to review new treating physician evidence showing diagnoses and treatments not previously in the record.  (R. 31).

Next, the ALJ determined that, through the date last insured, the claimant was capable of

performing past relevant work as a hand packer that did not require the performance of work-related activities precluded by the claimant's RFC.  The ALJ reviewed the testimony of the vocational expert to support this determination.  In the alternative, the ALJ also found that other jobs exited in significant numbers in the national economy that the claimant could perform.  Pursuant to the vocational expert's testimony, the ALJ found that claimant could work as an unskilled assembler, a machine tender, or a cleaner/housekeeper.  (R. 32-33).

Finally the ALJ concluded that the claimant was not under a disability, as defined in the Social Security Act, at any time from July 25, 2009, the alleged onset date, through December 31, 2009, the date last insured.  (R. 33).

## VI. DISCUSSION

The claimant did not file a brief in this matter.  The Eleventh Circuit has not addressed whether a social security disability claimant must file a brief with her original complaint in the district court, nor has the Court determined the specific consequences of a claimant not filing a brief with the district court.

The federal district courts differ in their approach to complaints unaccompanied by briefs.  The Southern District of Georgia has held the non-filing of a brief in a social security case to be a complete waiver of claims.  *See Walton v. Astrue*, 2010 U.S. Dist. LEXIS 11515, *5 n.3 (S.D. Ga. 2010).  The District of South Carolina has dismissed complaints unaccompanied by briefs for failure to prosecute.  *See Messer v. Comm'r of Soc. Sec*, 2011 U.S. Dist. LEXIS 152525 (D. S.C. 2011); *but see Shaw v. Comm'r of Soc. Sec.*, 1998 U.S. Dist. LEXIS 18414, *5 (N.D.N.Y. 1998) (holding that dismissing a claimant's complaint for not filing a brief too harsh).

However, the majority of districts, including the Northern District of Alabama, review the

28

record to determine whether the ALJ properly applied legal standards and supported his factual conclusions with substantial evidence, despite the claimant not filing a brief.  *See, e.g., Mitchell v. Apfel*, 1999 U.S. Dist. LEXIS 17549 (N.D. Ala. 1999); *see also Beckstrom v. Astrue*, 2011 U.S. Dist. LEXIS 38224, *6 (D. Az. 2011) (finding the filing of briefs unnecessary in social security disability complaints).  Moreover, the notice to parties issued by the clerk of this court upon receipt of social security disability benefits pleadings states that the court does not require briefs.

Having determined that the claimant's non-filing does not restrict review, this court has reviewed the record to determine whether the ALJ properly applied legal standards and supported his factual findings with substantial evidence.  The court will do this by briefly addressing each step of the five-step evaluation process, focusing on the conclusions of the ALJ that claimant might have cause to challenge.  For the reasons stated below, this court finds that the ALJ properly applied legal standards and supported his conclusions with substantial evidence.

### A. Steps 1 and 2: Employment and Severe Impairments

The first two questions in the evaluation process determine whether the claimant is presently employed and whether the claimant's impairment(s) is/are severe.  *McDaniel*, 800 F.2d at 1030; 20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ determined that claimant did not engage in substantial gainful activity during the period in question, giving claimant no reason to challenge this conclusion.

At step two, the ALJ found that claimant had a variety of severe impairments; however, he did not include her alleged heart problems as one of them.  In determining whether an alleged impairment should be considered severe, the ALJ must consider whether the impairment

significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.920(c); *see also* 20 C.F.R. § 404.921(a), *Crayton*, 120 F.3d at 1219.  A problem is not severe if the impairment is so slight and its effect so minimal that it would clearly not be expected to interfere with the claimant's ability to work, regardless of claimant's age, education, or work experience.  *McDaniel*, 800 F.2d at 1031; *see also Brady*, 724 F.2d at 920.

At the ALJ hearing, when asked which of her impairments keep her from working, claimant did not even mention her alleged heart problems.  Furthermore, the medical record reveals that claimant's complaints of chest pain were infrequent and the results of her various tests showed good heart function.  For these reasons, the court finds that the ALJ's decision not to include claimant's heart problems as a severe impairment is supported by substantial evidence.

**B. Step 3: Listings 12.04 and 12.06**

At step three, the claimant has the opportunity to prove that an impairment or impairments meet or equal a listed impairment.  *Barron*, 924 F.2d at 229.  The ALJ specifically considered listings 12.04 and 12.06 because those were the listings that claimant's legal counsel had argued that claimant met.

Listing 12.04 addresses affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1. To fall under the listing, a claimant must meet the requirements of *either* part A *and* part B, or must meet the requirements of part C.  The ALJ seemed to assume that claimant met the requirements of part A, as he moved directly to addressing part B.  The court finds that such a conclusion is supported by substantial evidence because the medical record reveals that claimant suffered from depressive syndrome characterized by at least four of the required characteristics.

30

Part B requires that claimant's depressive syndrome result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found that the claimant did not meet any of these requirements because her impairments caused no more than mild or moderate deficiencies in the categories in question and she only suffered from one or two episodes of decompensation.

Having reviewed the medical record, the court has not found any conclusions from any of claimant's treating physicians—or any other physicians—that reflect that claimant's impairments should be considered more than moderate, as required by the listing.  Further, the claimant's own testimony about her activities, the infrequency of her doctor's visits, and the conservative treatment of her symptoms all support the ALJ's finding.  As such, the court finds that the ALJ's determination that claimant does not satisfy the part B criteria of listing 12.04 is supported by substantial evidence.

Part C, the alternative avenue of meeting listing 12.04, requires:

> [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ found that claimant did not meet any of these criteria and the court agrees. Although claimant's depressive disorder has been documented for more than two years, the medical record reflects that it has been under control and is not characterized by repeated episodes of decompensation, does not make claimant likely to decompensate by marginal adjustments, and does not indicate that claimant would be unable to function outside a highly supportive living arrangement. Throughout the period that claimant has been diagnosed with depressive disorder, claimant has been adjusting to changes in her environment, such as the death of her sister and her niece and great-nephew coming to live with her. Furthermore, although living with family does provide a supportive living arrangement, claimant herself performs a great deal of the household duties and even testified that her husband does not help her that much. Therefore, the court finds that the ALJ's determination that claimant does not satisfy the part C criteria for listing 12.04 is supported by substantial evidence.

Listing 12.06 addresses anxiety-related disorders. According to the listing, "[i]n these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." Listing 12.06 requires that claimant meet the requirements either in part A *and* part B, *or* in part A *and* part C.

The ALJ seems to assume that the requirements of Part A are met; although the court does not necessarily agree with this unstated assumption, it will consider part A met for the

purposes of evaluating parts B and C, as did the ALJ.  Part B of 12.06 is identical to part B of

12.04; therefore, as already discussed, claimant did not meet its requirements.  Part C requires

that claimant's anxiety disorder results in a complete inability to function independently outside

the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ found that the claimant did

not meet this requirement and the court agrees. Both in her hearing testimony and in her various

disability reports, claimant described attending church, shopping, walking, and attending her

doctor's appointments alone, all of which reflect an ability to function independently outside of

claimant's home.  For these reasons, the court finds that the ALJ's decision that claimant did not

meet the requirements of listing 12.06 is supported by substantial evidence.

### C. Steps 4 and 5: Former Occupation and Other Work

At step four the ALJ must determine whether the claimant is able to perform her former

occupation, and at step five the ALJ must determine whether the claimant is able to perform any

other work within the economy.  *McDaniel*, 800 F.2d at 1030; 20 C.F.R. §§ 404.1520, 416.920.

Both of these determinations require that the ALJ review medical and other evidence to

determine the claimant's RFC to do work despite her impairments.  20 C.F.R. §§ 404.1520(e)

and 416.920(e); *see also Lewis*, 125 F.3d at 1440.

### i. RFC

In making an RFC assessment, the ALJ must consider all relevant evidence and

determine the claimant's ability to do work in spite of her impairments. *Lewis*, 125 F.3d at 1440;

*see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The ALJ makes this determination by

specifically considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R.

§§ 404.1545(b), 416.945(b).  In this case, the ALJ found that claimant had the RFC to perform

medium work with a variety of limitations.  The limitations imposed by the ALJ were based on the recommendations of Dr. Bailey, a consulting physician, who performed an RFC assessment.

Reversible error is present if the ALJ does not state with particularity the weight given to different medical opinions.  *Sharfarz*, 825 F.2d at 279; *see also MacGregor*, 786 F.2d at 1053. The ALJ here specifically gave great weight to the opinion of Dr. Bailey.  In relying on Dr. Bailey's opinions, the ALJ acknowledge that she was not a treating physician and her opinion was not entitled to the same weight as that of a treating physician.  The ALJ observed, however, that none of claimant's treating physicians made any recommendations as to claimant's RFC. Furthermore, the ALJ made an independent determination that Dr. Bailey's recommendations were supported by the medical record, including the opinions of consulting psychologist Dr. Crowder.

The ALJ also specifically addressed his lack of reliance on claimant's own claims, and his lack of reliance on claimant's GAF scores from the VA in making his RFC determination. The court will address each of these issues separately.

### a. Pain Standard

In evaluating subjective complaints, including pain, the ALJ must follow the Eleventh Circuit's pain standard evaluation.  "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt*, 921 F.2d at 1223.

If the ALJ chooses to discredit the claimant's testimony as to her symptoms, he must

34

articulate explicit and adequate reasons for that decision. *Foote*, 67 F.3d at 1561-62. Failure to articulate reasons requires that the court accept the testimony as true. *Id*. On review, a court should not disturb an explicitly articulated credibility finding that is supported by substantial evidence in the record. *Id.* In evaluating the claimant's complaints of disabling symptoms, the ALJ may consider the claimant's daily activities. *Harwell*, 735 F.2d at 1293.

In this case, the ALJ specifically applied the pain standard, finding that claimant's impairments *could* be reasonably expected to cause the alleged symptoms, but that her statements about the severity of her symptoms were not credible and were not supported by the medical evidence. In making this finding, the ALJ explained his reasons, as the Eleventh Circuit requires. Specifically, the ALJ pointed to the lack of any opinions from treating physicians, and the inconsistencies between claimant's alleged symptoms on one hand and both the medical record and her reported daily activities on the other.

The court finds that the record supports the ALJ's finding and his reasoning. Claimant's complaints were often inconsistent, reporting symptoms to one doctor one week and not even mentioning those symptoms to another doctor the next week. Her back pain and her depression—the two symptoms that she claimed kept her from working—were repeatedly noted by the doctors as being under control. Dr. Laughlin, one of claimant's physicians, refused to even perform an MRI on claimant's back when she requested one, believing that it was unwarranted and unnecessary. Claimant successfully performs a wide range of daily activities that demonstrate her ability to function at a level that is inconsistent with her alleged limitations. Considering the record as a whole, the court finds that the ALJ applied the proper legal standards in evaluating claimant's subjective complaints and that substantial evidence supports his finding

35

that her symptoms were not as severe as she claims.

### b. GAF

The ALJ also addressed claimant's GAF scores when making his RFC determination. A GAF score is a subjective determination that represents a clinician's judgment of an individual's overall level of functioning. *Wesley,* No. 99-1226, 2000 WL191664, at *3. A GAF score at or below 50 can indicate serious mental impairments in functioning. *McCloud*, 166 Fed. Appx. at 418 (citing the *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 1994)). When GAF scores revealing potentially serious mental impairments are present in the medical record, the ALJ must determine how much weight to give each particular score. *Id.* However, the GAF scale "'does not have a direct correlation to the severity requirements in [the] mental disorders listings.'" *Nye*, 524 Fed. Appx. at 543. As such, the ALJ is not obligated to rely on a GAF score in making his final disability determination. *Luterman*, 518 Fed. Appx. at 690.

The record reflects that claimant received several GAF scores between 45 and 50 in 2009 and 2010. In his opinion, the ALJ acknowledged and specifically addressed these scores and explained why he did not rely on them in determining claimant's RFC. The gist of the ALJ's concern was that the GAF scores were not supported by the medical evidence, as "the VA doctors gave no rationale or pointed to no specific clinical or objective evidence to support the given GAF scores." (R. 30). The court agrees with the ALJ's conclusions. Many of the records containing low GAF scores also documented improvement in claimant's symptoms and even contained statements showing an ability to function, such as "she is back to enjoying her craft." The various doctors—and sometimes nurse practitioners—making these assessments did not

adequately explain or justify their GAF scores to enable the ALJ or this court to rely on them.  As such, the court finds that the ALJ's disregard of claimant's GAF scores was supported by substantial evidence.

Because the court finds that the ALJ properly evaluated claimant's own allegations about her pain and symptoms, and because the ALJ was justified in not relying on claimant's GAF scores, the court concludes that the ALJ's RFC determination was the result of the application of proper legal standards and was supported by substantial evidence.

**ii. Past Work and Other Work**

Based on his RFC finding, the ALJ concluded at step four that claimant could perform her past work as a hand packer, and determined at step five that she could perform other jobs such as an assembler, a machine tender, or a cleaner/housekeeper.

At step four, when determining that the claimant can to return to her past relevant work, the ALJ must consider all the duties of that job and evaluate the claimant's ability to perform them in spite of her impairments.  *Lucas*, 918 F.2d at 1574; *see also Cannon*, 858 F.2d at 1545-46 (remanding to the Commissioner to determine whether claimant's past work included prohibited activities).  Under  20 C.F.R. § 416.960(b)(1), the ALJ must examine whether the claimant held the job within the past fifteen years, whether the job counts as substantial gainful activity, and whether the claimant learned to do the work.

In this case, the ALJ called on Marcia Shulman, a vocational expert, to advise him on which of claimant's past jobs could be considered past relevant work.  After Ms. Shulman narrowed claimant's former employment down to three past relevant jobs, the ALJ also relied on Ms. Shulman to advise him which of the jobs claimant could perform based on his determined

RFC, and which other jobs exist in the national and local economy that claimant would be able to perform.  The ALJ relied on Ms. Shulman's testimony in determining that claimant could perform both past relevant work and other work as well. Both the vocational expert's determinations and the ALJ's reliance on them were supported by the evidence in the record, including the claimant's various statements about her activities. Therefore, the court finds that the ALJ's decision is supported by substantial evidence.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 27th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE